This is number 21092, NAACP v. Raymond. And Ms. DeBrito, we'll hear from you first. Good morning, Your Honors. May it please the Court, my name is Olga Visotskaya DeBrito. I represent State Board Defendants. The issue before this Court is whether the North Carolina General Assembly intended to discriminate against Black and Hispanic voters when it enacted the North Carolina's FOTA ID law, SB 824. The totality of evidence presented to the Court on the motion for preliminary injunction did not support a finding of discriminatory intent. The District Court erred. Yes, Your Honor. I'm sorry to interrupt, but before we even get to the merits, we have these motions about mootness in front of us now. And I was hoping you could address one question for me. Assuming I agree that this is not moot in the jurisdictional sense, assuming I agree with you, that it's not impossible that these schedules will change and we could end up with a federal preliminary injunction still in place and having some effect, what about prudential mootness? We've held in some cases that when we're facing a difficult and sensitive constitutional issue, we should, we can use prudential mootness to avoid unnecessarily addressing it. And I was just wondering whether that might apply here, where it's unlikely that this injunction will have any concrete effect and where the question is certainly difficult and sensitive. And if we dismissed and vacated the District Court's preliminary injunction, you and the interveners would have all the relief you're asking for. Prudential consideration actually, in this case, weigh against finding of mootness. The state court very heavily placed its analysis on consideration of various federal laws. And the federal law's guidance, the federal court's guidance on federal law might actually change the outcome of what the state courts will do. So in addition to states' position that there is an Article III life case and controversy for reasons we explained in our response, we also believe that prudential considerations weigh against the finding of mootness. But the District Court critically erred in four different ways. First, the District Court incorrectly placed burden of proof, shifted burden of proof from plaintiffs to the state. Second, the District Court did not give enough consideration and enough weight to the fact that SB 824 is designed in a lenient way that allows exceptions and accommodations. Three, the District Court also erred when it improperly weighed the remaining consideration of Arlington Heights factors. They do not spark any suspicion of discriminatory intent on the record presented. And finally, the District Court also erred when it did not properly weigh important state interests, which support independently finding of validity of SB 824. Yes, Your Honor. Counsel, in articulating those four errors, the first one seems like a legal error to me. And I've read that and I want to hear more and hear all sides on that. The three other errors you talked about seem to discuss the way in which the District Court weighed evidence. And that's an issue over which a District Court is given discretion. And so it sounds to me like at least for the issues two, three, and four, you're talking about improperly weighing evidence, which I'm concerned might not be something we're supposed to do unless you say it's an abuse of discretion. We do say it's an abuse of discretion. And what we use in support of our argument is analysis of this court in McCrory, which found that clearly erroneous findings of fact could also be reversed. But I agree with Your Honor that on the first issue, it's an error of law. And Abbott v. Paris establishes that the challengers have burden of proof on discriminatory intent showing. Yet the court here found that it therefore seems eminently reasonable to make the state bear the risk of non-persuasion with respect to intent when the very same people who pass the old unconstitutional law pass the new. And then it doubled on that error. And it required the state in another portion of its opinion to purge the taint of past discrimination. This is clearly what the United States Supreme Court has. Yes, Your Honor. I'm sorry. I understand your argument. And I read the District Court opinion closely. And I see the parts you're talking about. What's confusing is that there are other parts, right, where the District Court clearly, properly states the burden of proof and purports to be applying it correctly. So I end up a little bit confused on this. It is difficult to separate when the burden of proof is mistaken to begin with. And the court requires the state to disprove that discriminatory intent has occurred. It has affected the remainder of the court's reasoning on Wayne Arlington Heights factors. For example, SB 824 is very lenient in comparison with laws that have been upheld in Texas, in Virginia, in South Carolina. The design of SB 824 allows more accommodations and exceptions and allows more ideas. Yes, Your Honor. Your point that you're just making about the relationship of this law to other laws is interesting to me. And if you could help me with this issue. One way we might look at that is to compare this law to the other laws that have been declared satisfactory under the Constitution or not unconstitutional. And maybe you're right, it's more lenient or at least less lenient. But does the procedural framework of this case call for that type of analysis? In other words, I think a lot of those cases came after trials on the merits. And so we would be looking at those issues with a perhaps different standard of review than we are here with a preliminary injunction. So help me understand whether we're supposed to do a straight comparison or whether the procedural position of this case dictates a different analysis. Our position on the record in this case is that discovery is now closed. And there is no additional evidence that this court does not have in front of it that the court could accumulate absent some kind of intervening factor. And this court has the best evidence that could be presented. It has the entire proceedings of the North Carolina General Assembly in passage of this law. So to the extent we need to inquire about the legislative history, about amendments. That doesn't include the intervener's proposed evidence, right? That's not properly before us. That's correct. So when you say we have all of the evidence, that's not totally accurate, right? Well, on intervention points, the interveners have not yet been allowed to intervene. This court has remanded to the district court for additional proceeding on the issue of intervention. But even on the record that has been accumulated, it is our position that that record did not allow district court's finding of discriminatory intent. Can I ask a separate question to the extent that it's relevant? When you say that we have all the evidence and that discovery is closed, do we take from that that the State Board is not going to offer any expert testimony in this case? I mean, I'm just trying to understand what you mean by we have all the evidence. At trial, is the State Board not going to respond to the expert testimony that's been provided by the challengers? So without disclosing too much of litigation strategy at this point, what I could tell to the court is that we provided people who are experts by professional training, maybe not retained experts. But the best expert with professional experience we have is an employee of the State Board who actually compiled the no-match lease that plaintiff submitted. I'm not asking the details, but you just said we have all the evidence, but then you say, well, wait a minute, here's this other evidence that maybe is going to show up at trial. I just want to understand what you mean by we have all the evidence now, nothing new is going to show up. That doesn't seem right. It seems like you're saying you've provided notice of some other people who may testify. No, Your Honor. I probably did not quite explain it eloquently. We have already provided, as part of this record, affidavits from the State Board's experts who compiled a no-match lease. We also provided affidavits from an expert-slash-factual witness who talked about the legislative history who actually is employed by the General Assembly. So we rebutted the evidence that plaintiffs put forth during the motion for preliminary injunction, and the record that we compiled did not allow, did not permit for district court to find likely discriminatory offenses. I'm sorry, I didn't mean to cut you off. I also really want to make sure I understand this, because I thought you said in your brief, and I noted it because I thought it was pretty compelling, that this record was underdeveloped, that it didn't make sense to do this on a preliminary injunction and on an underdeveloped record. But now you're saying even if there's a trial, nothing new is going to come out of that trial? Nobody's going to take the stand? Of course people will take stand, potentially, during the trial. The point we were making with the underdeveloped record is that on the record that the court had in front of it, it could not make a finding of likely discriminatory intent. But, for example, a person whose affidavit was provided as part of the motion for preliminary injunction, an employee of the State Board could take stand and testify and provide more explanation about how a no match list was compiled. We have provided his affidavit. His affidavit is part of the record already. But also the observation that we had in looking at other cases was the court found no discriminatory intent, that experts always disagreed, for example, on possession of the rights by minorities, or possession of qualified IDs rights. And the court would still find, despite all this difference in evidence, and sometimes the court would even characterize it as widely diverging evidence, the court, despite, for example, the differences in rates of possession of qualifying IDs in Virginia, in Texas, and in South Carolina, still found that there was no likely discriminatory intent. Counsel, if I could go back maybe to my first question now, and I've spent a decent amount of time with the record, and there's experts that the plaintiffs submitted. It looks like, without objection, which is a separate issue, but there's no objection in terms of Dalbert and issues like that. And it seems to me you're arguing about the way the judge weighed the evidence. And I appreciate those arguments, but it would seem to me at this type of proceeding, you have to show that the judge's weighing of the evidence was inconsistent with the law in some way, rather than they should have credited the evidence you put forth versus the evidence that the plaintiffs put forth. I mean, which is it, that the court gave too much consideration to the evidence and not enough to yours, or is what they put up inconsistent with the law in some fashion? So I think the way you divided the issues at the beginning of the argument, issue number one goes to an error of law. The shifting of the burden of proof was improper. Issue number two goes to whether or not judges' findings were clearly erroneous. And our contention, the state's contention, is that they were. That the judge did not give proper weight to the lenient design of SB 824 and overlooked undisputed facts regarding the legislative process and sequence of events, which the court has in its possession because we presented entire proceedings of the legislative session that adopted SB 824. So it's both. It's clearly erroneous and it's an error of law combined in this case. And yes, Your Honor. Can I ask you a question about the, you were just talking about how in these other cases similar laws were upheld, notwithstanding a finding of disparate possession of the relevant IDs. And I guess my question, it's similar, I guess, to Judge Quattlebaum's question, but slightly different, is what we're supposed to do with these cases when the relevant question is intent and not just the impact. Because, I mean, I'm thinking, I guess, of the Establishment Clause cases where, you know, in one jurisdiction they can have a moment of silence law, but in another jurisdiction the exact same statute is unconstitutional because the plaintiffs are able to show it stems from an impermissible purpose. And so it wouldn't be inconsistent legally to say that the exact same voter ID law would be permissible in one jurisdiction where there's no evidence of an impermissible discriminatory intent, but impermissible in a jurisdiction where there is such evidence. And so that's the part I'm struggling with in looking at these other cases. Your Honor, we agree that impact is one factor that is important for the court to consider, but that's not the only factor. It's a starting point, is how the courts described it. The other factors, such as sequence of events, legislative history, whether or not the opponents proposed any amendments that were adopted as part of the law also becomes important. Whether or not any opponents made any comments that were positive about the legislative process involved also becomes important. Whether or not there was any bipartisan support is also important. I'm sorry, so your short answer to me is, yes, that's right, but there is no evidence of discriminatory intent in this case, or there's not sufficient evidence. There is insufficient evidence of likely discriminatory intent. Because I'm comparing it to something like the South Carolina case where the only evidence they could find of discriminatory intent was, if I'm remembering right, a constituent had emailed one of the legislative supporters and said something evincing a discriminatory intent in the email, and the legislature had not quickly enough disclaimed the email, something like that. And so in South Carolina, they looked at a similar law and said, given that that's all you've got on discriminatory intent, we're fine with this. I mean, the discriminatory intent case here is somewhat more substantial, right? Your Honor, I think really important cases to compare on that issue are Vesey case and also McCrory case, where this court invalidated the prior voter ID law that North Carolina attempted to pass. And both of these cases describe the kind of drastic departures from procedures that took place that the court considered to be highly suspicious of discriminatory intent, including McCrory case where we have had five different procedures that the General Assembly, knowing rational disparity, passed. And the court found this omnibus law. Yes, Your Honor. I'm sorry. I apologize for cutting you off, but I see that you're already so far past your time. Let me see if I can. Let me tell you my concern, I guess. I agree with you that this case is, there is less evidence of discriminatory intent in this case than there was in McCrory. I absolutely agree with that. It also looks to me like there is much more evidence in this case, given the history, very recent history, very serious history, and the sort of factual linkages that the district court found between the predecessor law and the successor law. I also think there is much more here than there was in cases like Lee and South Carolina. So I feel like we're somewhere in between. And I'm wondering how I'm supposed to deal with that. I think that's where it's really important for the court, you know, understanding that we're looking at the totality of the circumstances to look at the design of the law and to see what the legislature has actually done, you know, in contrast with what we had in McCrory. And here we have a reasonable impediment provision. We have two different ways for voters to obtain a free voter ID. We have a single issue law, not an omnibus law. So it looks like the legislature, if you compare it to McCrory, has made entirely different choices here that went towards diminishing and ameliorating impact on the minority voters who might lack, in fact, IDs at disproportionate rates that qualify. So I think that's where it's important. It's important for the court to evaluate very seriously the design of the law. I know I'm waiting. Yes, I was going to just ask if either of my colleagues has questions, and if not, we'll let you rest and come back on rebuttal. Okay. Thank you very much. Thank you, Your Honors. Good morning, Your Honors, and please, the court. I'm David Thompson for the interveners, and with the court's permission, the state, and we have agreed that I'll handle the rebuttal, and we'd like four minutes if that's acceptable to the court. Thank you. So I'd like to dive in on the question of these other cases and whether we're asking the court to reweigh the evidence or not. The key case to look at is South Carolina, and South Carolina concluded that there was no disparate impact, and there was no disparate impact in that case because there was a reasonable impediment provision that was very similar to the one that is at issue here, and Judge Kavanaugh concluded that in light of that, there could be disparate impact, and that's the end of the case for the plaintiffs because under Irby. If I could stop you there, counsel, I mean, and you probably have it more on your fingertips than I do, but my memory of the South Carolina case was, A, the reasonable impediment provision, but, B, the absence of evidence that it had not been ineffective, and the district court, in talking about the reasonable impediment provision here, looked at evidence that in 2016 the reasonable impediment provision, which I grant you is not exactly the same, had not been effective. So how is that kind of a showstopper type issue when South Carolina seems to open the door for some analysis about the effectiveness of that type of provision? Your Honor, I'd like to make two points. The first is that under this court's jurisprudence, and I point to the 1989 decision in Irby, and the district court agreed with that in this case, the plaintiffs have to prove both discriminatory intent and discriminatory impact. If they fail on either prong, they lose in the Fourth Circuit. And on disparate impact, we accept, for purposes of this stage of the proceeding, the finding of fact made by the district court that there were 184 reasonable impediment ballots that were excluded. And that fact is the end of their case. And let me explain why. Because the intent that they are trying, they have to harmonize their theory of intent and their theory of impact. Their theory of intent is not that the General Assembly tried to target out of racial animosity minority groups. This court in McCrory specifically disavowed that. No, their theory of intent is that the General Assembly tried to entrench itself. The Republican majority did, by targeting African-American voters who vote Democratic. That's key, because if the impact they are identifying cannot entrench and further the alleged purpose of entrenchment, then they lose. And when you're talking about a state with 10 million individuals and 7 million voters, 2 million of whom voted in 2016, and you only have 184 individuals whose ballots weren't counted, and you couple that with the fact that the General Assembly looked at that 184 number and then took three separate steps to drive it lower. They made free IDs available at one-stop voting. They made it more narrow. Counsel, actually, I do want to go back to the thing you just said about the 184. I thought the district court was very careful to say that the disparate impact would come through the chilling effect, as well as through the actual exclusion of ballots, and that once people understand that the reasonable impediment thing doesn't always work, they will be less likely to try to vote if they don't have a qualifying ID. On the dissuasion point, Your Honor, the law generally presumes that people understand what the law is, and that makes particular sense here, because there are four separate mailers to every household in North Carolina under this law. There's a fifth mailer to those who are on the DMV no-match list. They also have no evidence, none whatsoever in this record, that those five mailers would somehow be ineffective. Their argument proves too much. If five mailers and there's still some residual confusion, then there'd be very few laws indeed, and they also haven't shown any marginal impact. To the extent there's confusion, it might come from the constitutional amendment. They didn't challenge that, so they'd have to show, and the district court made a legal error here, not analyzing the marginal dissuasion from the law as opposed to the amendment. Yes, Your Honor. Just before we leave the reasonable impediment thing, so one of the district court's concerns was about the subjectivity of the law, and I know you were, if I'm remembering the briefs right, someone, I think it was the interveners, was at great pains to explain that there's nothing subjective about falsity, which I totally understand, but I think what the district court was concerned about was the grounds to believe part of the statute and that there was no guidance as to what, you know, if you're a member of a county board and you're looking at one of these affidavits that says, for instance, my work schedule precluded me from getting an ID card, there was no guidance as to what would be a reasonable ground to believe that that was not true, and it seemed, and I just thought since I had the members of the General Assembly up here, I would try to get an answer to this question because it seemed like in front of the district court, the state's argument was, you're right, and there will never be such grounds. So this is basically an ineffective, this part of the statute will never be enforced. But that's, you know, we try to avoid interpretations of statutes that render them meaningless. So can you tell me what that part means, the part about what counts as grounds to believe something is false? Your Honor, it would be the same grounds that this court would have to assess if it were looking at a perjury or defamation case, you know, a statute says. There's all kinds of evidence. No, no, like is the board, is the member of the board supposed to check, like see what this person's work schedule is, or does it have to be facially false? Because when we're considering a perjury case. It's not a member, it's five members who have to unanimously agree, and they have to be bipartisan, which is highly protected. That's great, but what should they look at? What should they look at? They should look at the face. They're not going to conduct. Just the face. Their discovery, they look at the face of it. And unless all five of them agree unanimously that it is in fact false, then the ballot can't. And what can you give me an example of what might be grounds on the face of the ballot? Or I'm sorry, the affidavit for thinking it's false. Oh, sorry. I am back. My apologies to the court. I don't know what happened to the connection. No, no. Can you give me an example? The first point I want to make is they have not been able to identify a single even hypothetical, let alone. Can I ask you to answer the question? Okay, Your Honor, but to answer the question, you first need to try to identify a situation in which this would come up. Let me tell you where I'm going. Maybe that will enable you to just answer my question. The district court seems to have found and the state seems to have agreed that there would be no circumstances under which a board member would have grounds to believe that an affidavit was false. If that is so, I am wondering why there is something in the law that says these affidavits will be reviewed for falsity, because that seems to me to create an extra and entirely unnecessary chilling effect if this is a meaningless provision of the law. That's where I'm headed. If a voter comes in, I'll answer your question directly and then I'd like to amplify my answer. If a voter comes in and tells everyone in the polling place, I forgot my ID at home. I have an ID, but I forgot it. And they say, okay, well, here's a provisional ballot. And then they check other and they give an excuse other than I forgot it at home. Then they've lied. That would be false, Your Honor. Okay. So that's an example. We have never taken the position that this is meaningless and we reject the idea that it's meaningless. And what I was going to say about the 184 is that confronted with this minuscule number, the General Assembly drove it down by eliminating the bases for saying that you were denigrating the requirement, which was previously a basis for rejecting a reasonable impediment ballot. Making nonsensical statements was previously a ground that was rejected. And then there are the the the they eliminated the basis for a voter to challenge the reasonable impediment. Yes. Judge. Yeah. Counsel, if I could. And I'm sorry to cut you off on that point, but I want to shift to a separate issue. I think I understand the defendants and the legislature's position, expressing concerns about the extent to which the district court considered evidence about the prior law. And maybe or and as you say, or alleged shifted the burden potentially on there. So I get that point. But but two things, I think it'd be helpful if you could comment on one is there. There I think still is the in the record. And I think Judge Harris talked about the record here being different than some of these other cases. Evidence of these DOJ objections, these other lawsuits. That's part of the historical evidence here. And even the evidence that related to the prior law. I understand what Abbott says about it, about prior laws. But but what weight should we give evidence of discriminatory intent related to the prior law? That this court has found to exist now, should we give it none? Should we give it some? What what's the role of of of that evidence here? OK, so let me answer. There are two questions, Your Honor. Let me take them one at a time, if I may. And the first question about the other lawsuits, they point to 55 lawsuits, 45 of which were settled. There were only 10 that were adjudicated. The last time the state of North Carolina, the General Assembly, other than McCrory, was found to have enacted discriminatory legislation was decades ago in 1996. So the General Assembly should not be tagged with what some locality may or may not have done and settled a case. So we would reject the relevance of those suits. Now, with respect to your second question of, well, what about what happened before? McCrory was emphatic that it was emphasizing the omnibus nature of that legislation, which was critical because, remember, the intent was not to target out of racial animosity, but was to entrench. And so you're looking at an entrenchment motive. You look at the sweep, the scope, the character, the magnitude. That's the phrase that McCrory used. And here we have one law which is incredibly minuscule. And they tried to drive that minuscule number down through the mechanisms I've just identified. Yes, Judge Harris. Would we look at what happened to the other parts of the omnibus law on your – do you know what? The district court at a hearing expressed some concern that if all the legislature had done was break up an omnibus bill into several separate bills, that really wouldn't show much about a changed intent. So what's your response to that? Your Honor, I don't believe that has happened here, so that's an interesting hypothetical, and I don't know the answer to it. But it's not the facts of this case. The legislature did not go in and eliminate these other things. It came back to this issue and the people. And another thing about the history is we have an independent political actor that breaks the causal chain. We have the people of North Carolina coming in and saying, we want to have this law, putting it in the constitutional amendment. The plaintiffs could have challenged that. They made a strategic decision not to challenge the constitutional amendment. And so this court has to take that. Yes, Your Honor. Just to follow up then, I get the points. It seems to me like you're arguing that the historical evidence from the prior law and the historical evidence of the DOJ and other litigation matters is not relevant or not sufficient to show discriminatory intent. I guess my question is, it's evidence in the record, so is it fair for a fact finder to consider it and you object to the weight that it's been given? Or is it something that should be outside of the district court's consideration altogether? We're not saying it's irrelevant, Your Honor. But what we are saying is that they have to prove intent and impact. And if you just focus on the impact side of the ledger, the undisputed fact is that there was only 184 votes that were disregarded. That cannot be sufficient to support a motive of entrenchment. And on that basis, we win. And I'll reserve my four minutes for rebuttal, if I may. Thank you. Mr. Ulan, we'll hear from you. Thank you, Judge Harris. My name is John Ulan, and I'm proud to represent the NAACP plaintiffs in this appeal. At the outset, I'd like to focus on three points. First, this appeal is moved. We know that the November 2020 election in North Carolina, which is already underway, will be conducted without a voter ID requirement. The state court preliminary injunction in Holmes v. Moore prohibits enforcement of SB824 through the trial in that case, which is set for April next year. And with no further elections scheduled until September, that means no elections in which SB824 is implemented will proceed before the district court, in this case, issues its final decision following trial. And this court, therefore, cannot grant concrete relief to any party on this appeal. Defendants and interveners have acknowledged that vacating the preliminary injunction would give them all the relief they seek on appeal. And plaintiffs have asked this court to issue an order vacating the PI and dismissing the appeal as moved. That would terminate this appeal, which should not proceed to the merits, because there is no remaining justiciable controversy. Can I ask a question about that? When it comes to federal litigation, as the interveners point out, it seems pretty well accepted that the fact that one district court, you know, in California has enjoined the public charge rule, that doesn't deprive another district court in another jurisdiction of the jurisdiction, Article III jurisdiction, to enter a similar injunction. So why would the rule be different in this context? So we argue, Your Honor, that mootness is a factual inquiry. And there are facts before the court that indicate that this appeal has become moot. First, that the November election is proceeding without voter ID, which the state concedes. Second, that that concurrent injunction prevents enforcement, at least until the trial in April. And third, that our trial is scheduled in January. The court can draw factual conclusions and inferences from that evidence, and that evidence suggests that the preliminary injunction in this case is not likely to have any effect. And to the extent there's any doubt about that, the court can remove that doubt by vacating the PI when it dismisses this appeal as moot, which every party in this, to the appeal, has acknowledged would grant them full relief. Can I just ask you? Your Honor. I don't want to tie you up in mootness for too long. So I sort of, in kind of looking at the schedules and knowing that schedules sometimes change, I was sort of where you are in thinking that it is unlikely but not impossible that this preliminary injunction will ever have concrete effect. And that's what took me to prudential mootness, because in that situation, that's usually the bucket we're in. But the state has made this, has sort of responded to that with the idea that, well, for prudential reasons, we really ought to go ahead and decide this case because that would give some helpful guidance to the district court. Well, if there were to, it would give helpful guidance on these federal law questions. So what is your response to that? Our response to that is effectively what the state is asking for is an advisory opinion with respect to a controversy that no longer exists as a factual matter with respect to the preliminary injunction for this court. The court, again, mootness is a factual inquiry. The court has to make a determination whether there really is any possibility that the preliminary injunction will have any concrete effect on any party. We've laid out why we think it doesn't, and we're willing to have it vacated as an aspect of the order dismissing the appeal as moot. And then both the state court and the district court can make their independent determinations at trial with regard to whether this law was enacted with discriminatory intent as both found at the preliminary injunction stage. But it's not for the Court of Appeals or any federal court to issue advisory opinions with regard to the law when there is no concrete effect of the court's decision. Before we transition, can I just ask a factual question that I just want to make sure that I understand? Yes, Your Honor. There's some discussion about public assistance IDs and which ones have photographs and which ones don't. And you give some examples of public housing authorities as the type of IDs that do have photograph IDs. Would that fall under Representative Richardson's proposed amendment for state IDs? At least under North Carolina law, it appears that a local housing authority is not a state entity. And so what I'm sort of curious is as to why that example would qualify as a public assistance ID under Representative Richardson's proposed amendment. Does that make sense? It does, Your Honor. I'm not sure I can answer the question with regard to whether it would fall under the proposed amendment. The significance of the public assistance IDs question is whether the legislature excluded IDs from the list of qualifying ID under SB 824 that were known to be disproportionately possessed by minority voters. And, in fact, it did. So when the legislature, beginning in the process of drawing up its list of qualifying IDs for SB 589, prior voter ID law, when it tightened and narrowed that list following the Supreme Court's holding in Shelby County, it eliminated a number of IDs known to be possessed by minority voters, including public assistance IDs. And this Court, in finding that- The point here is that the suggestion was made that we should include public assistance IDs, and specifically state public assistance IDs. And Representative Lewis says there are no such IDs that have photographs on them. And nobody disputed that in the legislative history. And it seems like to me that that's, like, factually accurate and so provides a, you know, bona fide and legitimate reason to not include a null set. And you responded to that by saying, well, what about public housing authority IDs? But they are not state public assistance IDs. They're local agency IDs. And so I guess what I'm trying to get at is if they responded to that complaint by saying you're asking to include a null set, how can we infer from that some type of discriminatory intent? Your Honor, I would take a step back prior to the discussion of an amendment to add public assistance IDs, again, and focus the Court on the list that the legislature created of qualifying IDs. That's a list that does not include and excludes IDs that are known to be disproportionately possessed by black and Latino voters. And I'll leave this alone, but, yes, state public assistance IDs are more owned by minorities. But none of them have photographs. So the fact that they are more owned by minorities, I'll accept that as true. But if no state public assistance ID, state, which is what you've asked for, includes a photograph, I don't see how we infer anything from that. Well, among the things that we noted as evidence of discriminatory intent and being excluded included state-issued public assistance IDs, but also federal-issued public assistance IDs, any federal identification, including federal employer IDs, state and any state or local government employer ID, and any college or university ID. But none of those categories of ID is either included. Some of them are excluded entirely, and some of them require an approval process in order to be included, but none of them is entirely included in the list of qualifying ID. The way that list was narrowed in the first instance was with use of racial data about who possesses ID when the list was initially prepared for the prior voter ID law. And the law, the current voter ID law, has not been expanded to include forms of voter ID that are disproportionately possessed by minority voters, which makes this law, which is evidence of discriminatory intent, and to a point that was raised in connection with my opposing counsel's argument, also distinguishes this law from several of the other laws that it's compared to, which have a much wider range of IDs in the first instance on the list of qualifying ID that are known to be possessed by minority voters. Yes, Judge Qualifying? We talked earlier with opposing counsel about whether there was a shifting of the burden of proof, and I want to kind of go in that general direction. Abbott, aside from talking about or very related to talking about the burden of proof, says that there should be a presumption of good faith for legislation. And obviously that's in a redistricting case rather than a voter ID case. So my first question is, do you think that holding of a presumption of good faith applies here? And if so, did the district court articulate that at all in its opinion? Your Honor, I believe the district court faithfully applied the analysis that the Supreme Court suggested and held should be applied in cases like this. If you could just counsel, I'm sorry. My first question was, do you think that presumption of good faith that seems to exist in Abbott applies here? You can explain all you want, but if you could say yes or no, or that that's not a fair question, I'll accept anything. But I'd like to deal with that first. So I was trying to get to that, Your Honor. I'm not sure the answer is that it's not a fair question, but I think that it trends in a direction that's not the right standard for an Arlington Heights claim. What in Abbott looking at Arlington Heights factors? Yes, Your Honor. But what I think the point I'm trying to make is the burden of proof in Arlington Heights initially is on the plaintiffs, on the challenger, to demonstrate that the law was motivated, at least in part, by racially discriminatory motives. And this court faithfully applied that standard and looked to evidence of racially discriminatory intent by the legislature, and then found, based on that evidence, that there was a racially discriminatory intent behind the enactment of SB 824, and then shifted the burden, and again, as appropriate under Arlington Heights and under McCrory, to assess whether the state's asserted reasons, non-discriminatory reasons for passage of the law, would have motivated its passage notwithstanding the racially discriminatory intent. So it sounds like, I mean, it sounds like you agree, because you didn't say no, and I really want to be fair to you, that you agree that there's a presumption of good faith that stems from Abbott. And your belief is, I'm sorry, go ahead. No, what I was going to say, Your Honor, my point is, with regard to discriminatory intent, there's a burden under Arlington Heights and its progeny that falls on the plaintiffs in the first instance to demonstrate the presence of that discriminatory intent. Right, right. But Abbott goes on to, in talking about that burden, to say a presumption of good faith. And you don't seem to want to recognize that, and if there's a reason legally that's not right, please correct me. I'm just trying to, that to me informs the burden that exists, and I'm pretty sure the district court never talked about that. So if my legal analysis is off, please let me know. I don't want to cut off Judge Quattrobon, but I have the exact same question. So can I try to, I want you to answer us. I'm trying to figure out whether what you are saying is that the presumption and the burden are one in the same thing, that all the court means in Abbott is that because there is a presumption, the burden is on the challenger, or does the presumption have some effect beyond that? That's my question, too. So I'm sorry, I didn't mean to cut Judge Quattrobon off. I really want to get an answer to this. It's a fair question, and I don't mean to dissemble in response to Judge Quattrobon's question or yours, Judge Harris. I think that you've articulated it well. The point is that whether you articulate it as a presumption or whether you articulate it as a burden of proof, the point is that the plaintiffs have a burden, an evidentiary obligation to demonstrate racially discriminatory intent in the enactment of a law in order to establish a discriminatory intent claim under Arlington Heights and any of its progeny. And we would argue, and I feel very comfortable saying, if I may finish, Judge Richardson, that we do put on evidence that that burden. I really want you to answer the question. I mean, I understand Judge Harris's point. I understand Judge Quattrobon's point. I have no idea what you're saying. I just want you to answer the question. By the way, I'm totally fine if you say, I refuse to answer. But one way or the other, I have no idea what you're saying. So Abbott says there's a burden on the plaintiff and there's a presumption of good faith. And we know that presumptions and burdens are naturally different. Maybe they're the same, as Judge Harris suggests, and that's a fine answer, which I believe means, yes, there's a presumption of good faith, but it means nothing more than the burden. But I think Judge Harris is saying there is a presumption. We can talk about what it means. But you, for some reason, I just can't figure out, refuse to answer whether there is a presumption of good faith or not. I honestly recognize the language in Abbott, Your Honor. And I would argue, as Judge Harris's question at least implies, that what that means in the context of an Arlington Heights claim, is that there's a burden on the plaintiff to establish discriminatory intent as the premise of the claim and the first stage of the analysis of that claim.  Well, at least I did answer the question, Your Honor. Okay. Let me, if I could follow up with another point. Let's assume our analysis, and I'm not suggesting this is how we should look at it, but let's assume that one way we are looking at this is to compare the North Carolina SB 824 with the voter ID legislation in South Carolina, Virginia, and Alabama, the states that have been declared not unconstitutional or been upheld. Is it your position that this law as a whole would fail under an analysis like that? Well, I think it would fail under an analysis of comparing it to other state laws. Is that your question, Judge? If we look and say, look, these several laws have been upheld, and we're looking solely on that issue, and again, I'm putting aside the historical facts that I know you would talk about, but just looking at a comparison of the laws, it doesn't seem to me that you could really say that this law would be unconstitutional by comparing it with what's been upheld in these other states. Am I right about that, or am I wrong about that? Well, I would disagree with you on that point, Your Honor, two points. In each of the instances that Your Honor holds up, Alabama, South Carolina, Virginia, there are material differences both with respect to the circumstances leading up to the enactment of the law, and I think those are very significant and material, and with respect to the provisions of the law. So with respect to the circumstances leading up to the law, in none of those states— Just focus on the second—I'm sorry to cut you off, sir, I really am, but if you could focus on the second point, I would like to hear that. Sure. So I'll focus on beginning with the state of Alabama, for example. The Alabama law contained a broader list of IDs commonly held by minority voters, including all federal and state and local government employee IDs, student IDs from any university or college in the state of Alabama not requiring a further approval process. Alabama issued state voter ID cards from mobile units that went on a regular schedule year after year to every county in that state and to people's homes. That stands in contrast to what was described as a lackluster implementation of the North Carolina free ID provision. Alabama had an extensive educational campaign, including billboards, radio and TV advertising, a website specifically dedicated to voter ID. They have a positive identity provision where a voter can vote without an ID if a poll worker recognizes them. And Alabama took fully three years, as required by its statute, to implement the voter ID law before ever enforcing it. In fact, the 11th Circuit distinguished Alabama's experience with voter ID from North Carolina, specifically focusing on the broader range of IDs that qualify known to be possessed by black voters, as well as the legislative history of the law. And again, I don't think you can look at those laws simply in the abstract. They really do need to be looked at in context, in the context in which they were passed. I would note just with respect to Alabama, that's also a state that had an extraordinarily low number of people lacking qualifying IDs, something like 1.4 percent for white voters and 2.3 or 2.4 percent for minority voters. And those were the plaintiff's expert estimates. Similarly, the state of Virginia. So, Virginia is also a law in which there's no evidence of the exclusion of IDs disproportionately held by minorities. So, Virginia has an extremely broad list of IDs that qualify. That may flow from the fact that Virginia anticipated a preclearance under Section 5 when it passed its laws, which modified its law after the Shelby County decision came down, and modified it specifically to narrow the list of qualifying IDs. The Virginia list includes IDs disproportionately used by minorities, such as any state or federal ID, any student ID, any employer ID, whether private or public. And because of that broader list of IDs that are qualifying and permissible in Virginia, there's less need for ameliorative provisions. And even so, the free ID provision in Virginia, the Fourth Circuit observed, made free IDs available throughout the state using mobile ID stations. Not something that happened in North Carolina. In fact, in North Carolina, in the first year following enactment of SBA 24 and leading up to the PI hearing, in this case, only 1,700 free IDs were issued, which hardly puts a dent in the disparate impact that we demonstrated to the district court. Finally, South Carolina, with regard to the substance of the law, again, there's evidence that South Carolina went out of its way to make sure that voters who needed them got free IDs, actually sending mobile stations not just everywhere around the state, but into people's homes to issue free IDs. Again, that's unlike the very limited effort in North Carolina. And their reasonable impediment provision during the course of litigation was stipulated, and this was a condition of the preclearance, stipulated to being a declaration that the voter is who they say they are, which, again, is very, very different from the reasonable impediment declaration in North Carolina, which requires the voter to attest under penalty of perjury to one of a number of enumerated impediments. Judge Harris? I'm sorry, sir, I literally just, I missed a word you said. Can you just go back to the reasonable impediment provision in South Carolina, what you said after that? Yes, Your Honor. The reasonable impediment provision in South Carolina during the course of the litigation as a condition of preclearance, the state stipulated essentially to that provision becoming a declaration by the voter that they are who they say they are. Thank you. And that's different in kind from a declaration that the voter meets one of a number of specified reasonable impediments that are identified in the statute. Thank you, sir. Your Honor, those are the differences in the substance of the law. I would say, if I have a moment, that for each of those laws it really is critical that there was, in South Carolina, the court held no evidence of discriminatory motive in its enactment. Both the Virginia and Alabama district courts found no discriminatory intent, and so the burden of proof was exactly the opposite of what pertains here where the district court did find a discriminatory intent. Yes, Your Honor. In connection with that, I just want to ask you what I am actually, my genuine concern about this case and what I'm struggling with is how much weight you can put on the history here. And I take your point that in all of these other cases there was not the same kind of kind of immediate historical evidence that we are grappling with here. And I understand that we can't just ignore that. But at the same time, we are instructed in the Abbott case, and we said this in McCrory too, that the fact that a legislature passes one voter ID law with a discriminatory intent doesn't forever disable the legislature from passing a voter ID law. And this one is better, right? It has these ameliorative features that the prior law didn't have. And those are features that, as we've just discussed, other courts have sort of specifically approved. And so what I'm concerned about, or I guess my question is, I guess, if this isn't enough, under what circumstances in your view could this legislature with its history pass a voter ID law? So, first of all, Your Honor, it's a difficult question to answer in the abstract, and I hesitate to do it, but I am going to answer the question. At the outset, context matters. So the fact that this law was passed in the context of not just history but contemporaneous action by the North Carolina General Assembly to undermine the voting strengths of blacks and Latinos for the purpose of entrenching the Republican majority, that's what this court found in McCrory, it's what was found by other federal courts in the racial gerrymandering litigation where all of the state's legislative maps from 2011 were thrown out as racial gerrymanders. It's what the federal court in Covington found again in 2017, where it threw out the state's remedial maps as racial gerrymanders, is what I meant to say. And it was found by the state court. Counsel, if you could just get to, I mean, I don't mean to interrupt you, but we understand the historical issue. I mean, we've read about that, we understand you there. If you could answer the question, what in terms of terms of the legislation would be okay in your view? Maybe not okay, because you probably think it's bad for other reasons, but what would make it constitutional? So, Your Honor, again, that's the question that's difficult to answer in the abstract. What I would say in response to Judge Harris is the legislature could start by not saying that they're intending to pass a law with the same purposes as HB 589, which this court found racially discriminatory. They could start by avoiding disparaging the court's decision in McCrory and the judges who issued that decision. They could take time to study the problems that they claim the law is intended to address, and they could craft a new and non-discriminatory law through a truly bipartisan process. They could avoid rushing the law through in the final days of a supermajority that was achieved through racial gerrymandering that allowed one party to ignore the concerns of the opposition and of the governor of North Carolina. They could avoid relying on rationales like preventing voter impersonation or promoting voter confidence, which this court rejected as pretextual in McCrory, and as to which there was no new evidence either before the legislature when it made the decision to enact SB 824 or before the district court when it issued its preliminary injunction. Ultimately, we would argue the district court analyzed what the legislature did here under the Arlington Heights standard and made the appropriate determination that context cannot be ignored when determining whether this law, SB 824, was adopted with discriminatory intent and for an improper purpose. Unless either of my colleagues has any questions. All right. Thank you very much. Thank you, Your Honor. I think it's Mr. Thompson, you have the rebuttal time. Yes, thank you, Your Honor. So I'd like to start on this issue of the broader reference was made to the fact that in some states there's a broader list of IDs. But it's really important to understand that a legislature can protect the franchise in this type of law in one of two ways. One is having a sweeping number of IDs. And the second is to have a sweeping reasonable impediment provision. Counsel, can I stop you there? Because this is actually something I was hoping we would get to. So I don't understand that. I mean, just speaking from common sense as a voter, it's obviously much easier to vote in a voter ID state if you have an approved ID. It's harder to vote. It requires more effort if you have to show up, fill out a declaration, fill out an affidavit. And you might think that the difference is pretty marginal. Like, whatever, it takes a couple of extra minutes. You have to swear something out and someone's going to be reviewing it to make sure it wasn't false. It's a modest extra amount of work. But it is an extra amount of work. So I don't see how those two things are equivalent. Like, if you have to go through the remedial provisions, you have made it harder to vote. You either have to haul yourself over to get the voter ID or you have to show up and fill out all these forms and swear under penalty of perjury that this stuff is true. It's harder. You might think it's a marginal difference, but it's different. So I don't see how those two things are equivalent. It is not harder, Your Honor. Yet Judge Kavanaugh and Judge Bates and Judge Kolarkatelli said it wasn't harder ex ante because the lines might be shorter for the reasonable impediment. So you can't say that it's harder, number one. Number two, and Joel Ford in his declaration was very clear on this, that the one-stop voting, you can go and get your free ID when you one-stop vote. So there is zero, and I mean zero marginal cost to getting these free IDs. Okay. So you think, but that goes back to the district court said there is a cost to getting the free IDs, that there is a cost in time, that it's a burden. You think the district court misweighed the evidence on that? I think the district court did not consider the fact that you can get it at one-stop voting. Now, the other point I would make is my friend from the NAACP said, well, you could have a truly bipartisan situation. In Lee, in Virginia, there was one Democrat and one independent. Here we have four Democrats, four Democrats who supported this law, a law which we are told would retrench the Republicans. Why would four Democrats vote in favor of a law that would entrench Republicans? It simply doesn't make any sense. They talk about bipartisanship. Here we had an African-American primary sponsor, Joel Ford, who opposed 589. He opposed the law that was at issue in McCrory, and he was a primary sponsor here. And if you read his declaration at JA 2068, you will see a process that was both regular and that was quintessentially bipartisan. You see that in JA 1761 to 1763, which is a critical provision, a portion of the legislative history, where Representative Richardson and Lewis are talking in good faith about the amendment to the public assistance ID. Lewis invites another amendment, and it never comes. We're told that some of the other states, like Alabama, had extensive education. This law requires four mailers to every residence in the House and a fifth one to anyone on the DMV list. We're told in other states, lots of people have the IDs. Here, 99.9% of the people who showed up in March of 2016 had the IDs. And really, when you listen to what were they supposed to do, there was not a clean, coherent answer. This was a bipartisan, regular process done in response to the compelling governmental interest of adhering to the Constitution of North Carolina, which under Widmar is a compelling governmental interest, if there are no further questions. So thank you very much. Thank you very much. Normally, we would come down now and shake hands with counsel. We regret that we are unable to do that. But we do thank you very much for your help today, and we appreciate you being here. We will take a very brief recess now, just so we can get the new lawyers in place. Thank you very much.
judges: Pamela A. Harris, Julius N. Richardson, A. Marvin Quattlebaum Jr.